**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Shawn Bergerson,                                    Civil No. 03-1090 (DWF/SRN)

        Plaintiff,

v.                                                  **MEMORANDUM**
                                                    **OPINION AND ORDER**

Deephaven Capital Management, LLC,

        Defendant;

and

Deephaven Capital Management, LLC,

        Counter-Claimant,

v.

Shawn Bergerson,

        Counter-Defendant.

---

Douglas L. Elsass, Esq., and Terence M. Fruth, Esq., Fruth Jamison & Elsass PA, counsel for Plaintiff and Counter-Defendant.

Carol M. Douglas, Esq., Ungaretti & Harris; Beth A. Black, Esq., Morgan Lewis & Bockius; and Steven E. Rau, Esq., Flynn Gaskins & Bennett, LLP, counsel for Defendant and Counter-Claimant.

---

### Introduction

The above-entitled matter came before the undersigned United States District Court Judge on

December 15, 2005, pursuant to Plaintiff Shawn Bergerson's Motion for Summary Judgment against

Defendant's Counterclaims, and pursuant to a Motion for Summary Judgment brought by Defendant

Deephaven Capital Management, LLC ("Deephaven").  For the reasons set forth below, Plaintiff's

motion is granted in part and denied in part; Defendant's motion is granted in part and denied in part.

## Background

This case arises out of a dispute between Deephaven and Bergerson regarding Bergerson's

purported retention and use of Deephaven's alleged confidential proprietary information after Bergerson

left his employment with Deephaven.  Undisputedly, the only claims remaining in this case are

Bergerson's claim for breach of contract and Deephaven's counterclaim for misappropriation of trade

secrets or breach of employee confidentiality.

Deephaven is a hedge fund investment company in Minnetonka, Minnesota, that is owned by

Knight Trading Group ("Knight") of New Jersey.  Bergerson began working with Deephaven in

February 1999.  Initially, Bergerson managed Deephaven's Convertible Arbitrage Portfolio.

Bergerson's initial employment was governed by an employment agreement dated February 5, 1999.

In late summer or early fall 2001, Deephaven's then-Chief Executive Officer and Chief

Investment Officer, Irv Kessler, told the Knight Board of Directors that he intended to leave

Deephaven.  At that time, the Knight Board became concerned that it would lose investors once

Kessler left.  As a result, the Knight Board decided to promote Colin Smith to CEO and to promote

Bergerson to CIO.  In addition to his new responsibilities as CIO, Bergerson continued to manage the

Convertible Arbitrage Portfolio and served on Deephaven's Management Committee.  Bergerson

acknowledges that his new position did not involve him directly managing other portfolios, including the

International Convertible Arbitrage Portfolio, but rather that he would be limited to oversight

responsibility for this and other portfolios.  In his position as CIO, Bergerson was responsible for

managing over $1 billion of Deephaven's hedge funds.

Bergerson's compensation was governed by an employment agreement (the "Employment

Agreement") dated December 21, 2001, and signed by Bergerson on January 29, 2002.[1]  The term of

the Employment Agreement ran through January 15, 2003.  The Employment Agreement stated:

> Commencing January 1, 2002, your new title will be Chief Investment Officer of
> Deephaven.  Deephaven shall remain located in the Minneapolis, Minnesota region
> during the term of this agreement.  You will be a member of Deephaven's Management
> Committee, which governs the activities of Deephaven and which presently consists of
> the Chief Executive Officer and the Chief Investment Officer of Deephaven and a
> Senior Officer of Knight Trading Group, Inc. ("Knight") to be determined.  Knight
> maintains discretion to change the structure of Deephaven management.

> Commencing January 1, 2002, a pool will be established consisting of 10% of the
> trading profits from the Convertible Arbitrage Portfolio managed by Deephaven
> (defined as pre-bonus accrual net income less trading expenses assessed to fund
> investors plus the management fee and before the incentive fee).  For 2002, provided
> you are still employed by Deephaven at December 31, 2002 and in return for your best
> efforts, you will receive (i) a maximum of 80%, and a minimum of 70%, of the
> aforementioned pool with any remaining amount to be distributed to the remaining team
> members, and (ii) 15% of Deephaven's annual net, pre-management compensation,
> pre-tax earnings ("Earnings").  Such Earnings shall not include profits earned with
> respect to appreciation in Deephaven's general partner interest in the Deephaven funds
> or appreciation in any option received from such funds.  It is understood that Earnings
> shall not include any charges by Knight to Deephaven that are (a) inconsistent with past
> practice; (b) disproportionate to charges being allocated to other subsidiaries; or (c)
> disproportionate to the value of the services provided.  For purposes of this calculation,
> $2 million dollars of consulting fees paid to Irv Kessler shall be included in the expenses
> of Deephaven for 2002.  Such payment shall be made in a lump sum, less applicable
> taxes, to you by January 15, 2003.  In addition to your compensation which won't be
> altered during the term hereof, you will be entitled to participate in standard benefit

---

[1]     Bergerson initially executed the Employment Agreement on December 21, 2001. Subsequently, after Bergerson expressed concerns regarding the 80% cap on his bonus, the parties executed the new Employment Agreement, as stated here, which included a 70% floor provision on Bergerson's bonus.

plans afforded to all employees of Deephaven.

If you are terminated for "Cause" or if you voluntarily terminate your employment with Knight prior to the end of the year, you will not be entitled to any of the aforementioned compensation. For purposes of this agreement, the term "Cause" shall mean (i) misappropriation of any material amount of money or other assets or properties of Knight Trading Group or any subsidiary or affiliate of Knight Trading Group; (ii) a material breach by you of the terms of this agreement, which breach shall remain unremedied for 30 days after notice of the same shall have been given to you by Knight Trading Group; or (iii) the conviction of you for a felony.

If your employment is terminated by Knight without "Cause", you shall be entitled to your pro-rata share of your compensation (8% of the trading profits of the Convertible Arbitrage Portfolio, 15% of Earnings and salary) through the end of that calendar month in which your termination occurs. Such payment will be within 30 days after the end of the month of termination. Such compensation shall be paid by Knight without claim of setoff or recoupment by Knight and without any obligation on your part to mitigate any damages suffered by Knight. Termination without Cause may not occur unless the Chief Executive Officer and the Senior Knight Officer on the Deephaven Management Committee agree to dismiss you.

You will continue to receive your current salary and will be entitled to participate in all benefits afforded to senior management employees of Deephaven.

In the event an agreement is not reached with you by September 30, 2002 regarding your continued involvement with Deephaven for 2003, you will be permitted to work on other business ventures, so long as such work does not materially interfere with your work obligations at Deephaven and you continue to use your best efforts through the end of 2002 at Deephaven.

You will continue to be an employee at will and will continue to be subject to all the policies of the firm as the firm may determine from time to time, provided that such policies are uniformly applicable to management employees of Knight.

The terms of this agreement shall be confidential and shall not be disclosed without the prior written consent of the non-disclosing party, unless disclosure is required by law.

This agreement supersedes all previous discussions and agreements and constitutes the entire agreement between us.

(Affidavit of Steven E. Rau ("Rau Aff.") at ¶ 2, Ex. 1.)   Bergerson admits that Deephaven and Knight

had little leverage in making the agreement.  (Plaintiff's Memorandum Opposing Deephaven's Motion for Summary Judgment ("Pl's Opp. Mem.") at 8.)  Initially, as noted above, the Employment Agreement stated that Bergerson would be entitled to a bonus not to exceed 80% of the Convertible Arbitrage Portfolio bonus pool, but Plaintiff subsequently was successful in negotiating the 70% minimum for this bonus.

During mid-2002, Knight considered selling Deephaven's business.[2]  Knight began discussions with Kessler, and Colin Smith, who became the Deephaven CEO upon Kessler's departure. Bergerson asserts that he, too, had been promised good faith negotiations on a transaction to sell the business, but that no one at Knight told him about its efforts to sell at this time.  Knight Board meeting minutes from October 15, 2002, demonstrate that negotiations were proceeding among Knight, Smith, and Kessler.  (Affidavit of  Douglas L. Elsass ("Elsass Aff.") at ¶ 18, Ex. Q.)  Around this time, Bergerson learned of Knight's discussion with Kessler and Smith and indicated that he was interested in having the good faith negotiations that he had been promised.  (Elsass Aff. at Ex. U.)  Ultimately, for some reason, the sale to Kessler and Smith did not occur.

In late 2002, Deephaven informed Bergerson that it would not be renewing his contract after it expired on January 15, 2003.  Bergerson asserts that although Deephaven knew that Bergerson would not be continuing beyond January 15, 2003, it waited until very late in the year to notify Bergerson.  In a letter sent to Bergerson on December 12, 2002, John Bluher, Deephaven's Executive Vice President and General Counsel, stated:

---

2        Apparently, Knight had considered selling the business in late 2001 as well, but these plans

(Continued on Next Page)

As you know, the term of your employment contract ends January 15, 2003, and we have determined not to renew it. Through January 15, 2003, you will continue to hold the title of Chief Investment Officer of Deephaven, you will continue to be a member of Deephaven's Management Committee, and you will use your best efforts to transition the management of the Domestic Convertible Portfolio. On January 15, 2003, at the close of business, your employment will be terminated.

Management has hired a new Portfolio Manager for the Convertible Portfolio. This afternoon we will be sending a letter to our investors and employees describing the changes we have put in place. Beginning December 18, 2002, Shailesh Vasundhra will be working with you to manage the Domestic Convertible Portfolio. Shailesh will take full responsibility for the portfolio on January 16, 2003.

As you know, as part of your employment with Deephaven, you signed an employment agreement. This agreement requires, among other things, that you "use your best efforts" while employed at Deephaven. During this transition period, we expect that you will conduct yourself in a professional manner. We expect that you will treat everyone you come in contact with, including our employees, consultants, service providers and investors, with respect. Your failure to do so will be considered a breach of your employment contract.

In addition, your employment agreement provides that you "will continue to be subject to all the policies of the firm, as the firm may determine from time to time, provided that such policies are uniformly applicable to management employees of Knight." I have attached a copy of Knight's policies with respect to Confidential and Proprietary Information. These policies provide, among other things, that "Employees are obligated to maintain the confidentiality of all information about [Deephaven] or its clients that they obtain during the course of employment." Moreover, our policies provide that "Employees remain subject to the prohibitions on disclosure of confidential information even after severing employment with Deephaven."

During your employment at Deephaven, you have learned a great deal of confidential information about Deephaven's investors. This confidential information includes the identities of primary contacts of Deephaven's investors, their financial condition, their ability to invest, their business goals, and their levels of interests. Contacting these individuals and discussing their investments would be inappropriate use of Deephaven's confidential information and a breach of your employment agreement. In addition, if

---

(Continued from Previous Page)
never came to fruition.

> investors contact you after today's announcement, you are to refer all inquiries directly
> to CEO, Colin Smith.
>
> Under the terms of your employment agreement, you have agreed to be bound by the
> Knight Employee Handbook and Policies.  As such, you may not disparage Deephaven
> and its officers and employees, solicit Deephaven's investors, or use or disclose
> Deephaven's confidential information.  If you disparage Deephaven and damage
> Deephaven's relationships with its investors, you will be tortiously interfering with
> Deephaven's contracts and its business relationships.

(Rau Aff. at ¶ 5, Ex. 4.)  On January 15, 2003, Deephaven paid Bergerson a bonus of $11,641,713.15

pursuant to the Employment Agreement.  In addition, Deephaven paid Bergerson his base salary of

$13,390.00 through January 15, 2003.

While Bergerson was finishing up his role at Deephaven, he began to set up his own hedge fund,

Waterstone Capital Management, which he currently manages.  By its counterclaim, Deephaven asserts

that Bergerson misappropriated trade secrets from Deephaven and otherwise unlawfully competed with

Deephaven.  Deephaven's claim relies primarily on a Knight Trading Group document entitled "Knight

Trading Group, Inc. Policy Statement Regarding Confidential and Proprietary  Information, and

Personal Trading" (the "Knight Policy Statement").  (Rau Aff. at ¶ 3, Ex. 2.)  The Knight Policy

Statement defines confidential information as "nonpublic information provided by an external source with

the expectation that the information will be kept confidential and used solely for the business purposes

for which it was conveyed by the external source."  (*Id*. at 4.)  Confidential information is also defined

as "materials generated by the Company that contain or are derived from such confidential information."

 (*Id*.)  As to handling confidential information after an employee is terminated, the Knight Policy

Statement states:

> KTGI Associates remain subject to the prohibitions on disclosure of confidential information even after severing their association with the Company. This prohibition lasts until such time as the information has become generally available to the investing public or the Company has approved its disclosure.

(*Id.* at 3.)

In his claim for breach of contract, Bergerson asserts that he was not paid certain compensation due him under the terms of the Employment Agreement. Specifically, Bergerson asserts that he did not receive all of the bonus compensation to which he was entitled for 2002, and that he did not receive any bonus compensation for January of 2003. First, Bergerson asserts that Deephaven failed to pay him approximately $1.2 million that was due to him for his share of the international convertibles bonus pool. Second, Bergerson contends that Deephaven undercalculated his CIO bonus by over $630,000. Finally, Bergerson maintains that Deephaven violated his Employment Agreement by changing the rules for the valuation (or "marking") process for the funds that Bergerson managed, thus resulting in an underpayment of approximately $370,000.

In addition to these alleged underpayments, Bergerson asserts that Deephaven violated the Employment Agreement by using money from Bergerson's bonus pool to pay a $1.25 million signing bonus to Bergerson's replacement, Shailesh Vasundhra. Specifically, Bergerson contends that the Employment Agreement required that any amount not paid to Bergerson from the convertible funds' bonus pool be paid to Bergerson's remaining "team members." Because Vasundhra had no duties as to the convertible trades, Bergerson contends that Deephaven's payment to Vasundhra of $1.25 million from the 2002 bonus pool violated the terms of the Employment Agreement.

8

**Discussion**

## I.      Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving

party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The court must view the

evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable

to the nonmoving party.  *Enter. Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996).

However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not

as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which

are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and

that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d at 747.  The nonmoving party

must demonstrate the existence of specific facts in the record that create a genuine issue for trial.

*Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly

supported motion for summary judgment may not rest upon mere allegations or denials, but must set

forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

## II.     Defendant's Motion for Summary Judgment

Deephaven has moved for summary judgment on several issues, asserting that Bergerson is not

entitled to any additional compensation for 2002 or 2003.

### A.      Bergerson's 2002 Compensation

Deephaven's motion for summary judgment initially focuses on several aspects of Bergerson's

2002 compensation claims.  First, Deephaven asserts that Bergerson is not entitled to 80% or more of

the convertible arbitrage portfolio pool.  Second, Deephaven contends that Bergerson is not entitled to

proceeds from the international convertible arbitrage pool.  Third, Deephaven maintains that Bergerson

has failed to set forth evidence supporting a claim regarding the valuation or "marking" of the convertible

arbitrage portfolio.  Fourth, Deephaven asserts that Bergerson has not set forth evidence to support a

claim regarding the calculation of his CIO bonus.

### 1.      The Convertible Arbitrage Portfolio Pool

Undisputedly, Bergerson received 70% of the domestic Convertible Arbitrage Portfolio pool for

2002.  Bergerson asserts, however, that he is entitled to at least 70% of the *domestic and*

*international* Convertible Arbitrage Portfolio managed by Deephaven.

"Convertible Arbitrage Portfolio managed by Deephaven" is not defined in the Employment

Agreement.  Bergerson asserts that he understood the phrase to encompass both the domestic and

international funds, and that this understanding reflected how he was paid in the past.  In support of his

position, Bergerson points to testimony from Anthony Sanfillippo (Knight's former Executive Vice

President) and Peter Hajas (Knight's former CEO) in which they each stated that they did not intend

Bergerson's compensation structure to change pursuant to the new Employment Agreement.  (Elsass

Aff. at Ex. 2, Deposition of Anthony Sanfillippo ("Sanfillippo Dep.") at 36; Ex. 6, Deposition of Peter

Hajas ("Hajas Dep.") at 88–92.)  Deephaven, on the other hand, asserts that Convertible Arbitrage

Portfolio referred only to the domestic convertible arbitrage portfolio.  In addition, Deephaven points to

an affidavit submitted by Bergerson in support of a motion for temporary restraining order that was

brought before this Court, in which Bergerson stated, "The convertibles fund is known as the

Deephaven Domestic Convertible LLC . . . ."  (Affidavit of Shawn Bergerson at ¶ 3.)

The Court finds that the meaning of "Convertible Arbitrage Portfolio" is ambiguous, and a

genuine issue of fact exists as to the interpretation of the term.  Even if the Court were to consider

Bergerson's previous affidavit some sort of "judicial admission," as Deephaven suggests, the language of

Bergerson's affidavit does not directly address the phrase at issue.  Because a genuine issue of material

fact exists as to whether the term "Convertible Arbitrage Portfolio" referred to both the domestic and

international portfolios, or to just the domestic portfolio, summary judgment on this issue is denied.

Bergerson also asserts that Deephaven breached the Employment Agreement by using money

from the domestic convertible bonus pool to pay employees who were not "team members" for that

fund.  Specifically, Bergerson points to a $1.25 million bonus that was paid from the domestic

convertibles fund as a signing bonus to Vasundhra when Vasundhra was hired to replace Bergerson.

Bergerson asserts that Deephaven used a total of $1,703,598 to pay employees who were not on the

team and to pay for overhead expenses.

The Court finds that summary judgment on this issue is appropriate.  Undisputedly, Bergerson

received 70% of the domestic Convertible Arbitrage Pool.  This complies with the 70% floor mandated

by the terms of the Employment Agreement.  Even if some portion of the pool went to non-team

members, it would be the other team members that would have standing to make a claim to these

monies, not Bergerson.  For this reason, summary judgment on this issue is granted.

**2.      Marking**

Under the terms of the Employment Agreement, Bergerson's bonus pool was to be "established consisting of 10% of the trading profits from the Convertible Arbitrage Portfolio managed by Deephaven." The trading profits were driven by the marking process, which involved developing a profit and loss statement for each fund at the end of each month. The fund manager would then approve the profit and loss statement, which in turn was used to determine the trading profits for that month.

Bergerson asserts that Deephaven breached the Employment Agreement by changing the marking process used for the valuation of the Convertible Arbitrage Portfolio. Specifically, Bergerson asserts that up until December 2002, Bergerson had the final say as to the marks. After that time, Bergerson asserts that Deephaven's General Counsel, Jim Korn, and Vasundhra helped decide the marks that would ultimately determine Bergerson's bonus pool. Bergerson contends that Vasundhra and Colin Smith had financial incentives to set the marks as low as possible, because the lower marks would start January 2003 at a low figure, thereby increasing the likelihood that the amount of trading profits would increase under Smith and Vasundhra's watch. Finally, Bergerson asserts that Deephaven breached the Employment Agreement by changing the rules of the marking process for December 2002, resulting in $344,890 in damages to Bergerson. Deephaven, on the other hand, contends that Bergerson has not demonstrated that he had the contractual right to mark the portfolio himself. In addition, Deephaven asserts that there was nothing unusual about allowing persons other than Bergerson to value Bergerson's portfolio, and the portfolio was not marked improperly. Finally, Deephaven asserts that Bergerson is not competent to testify as to valuation issues regarding Deephaven's securities.

The Court finds that summary judgment is improper on this issue.  Bergerson has raised a genuine issue of fact as to what the parties' policies and practices were regarding the marking practice. Even if Bergerson cannot testify as an expert, a question the Court need not reach at this time, Bergerson can testify regarding his understanding of the valuation issues. Bergerson's testimony would not undermine the integration clause in the Employment Agreement because the Employment Agreement is silent as to the manner in which the portfolio would be marked.  For these reasons, Deephaven's motion for summary judgment on this issue is denied.

### 3. The CIO Bonus

The Employment Agreement requires that Bergerson be paid "15% of Deephaven's annual net, pre-management compensation, pre-tax earnings," the so-called "CIO bonus."  Bergerson asserts that Deephaven did not properly add back all amounts for management compensation before it calculated the 15%, resulting in an underpayment of $631,541.  The Court finds that genuine issues of fact remain as to whether Bergerson's CIO bonus was calculated correctly.  As a result, summary judgment on this issue is denied.

### B. Bergerson's 2003 Compensation

Deephaven also asserts that Bergerson is not entitled to any additional compensation for January 2003.  Specifically, Deephaven asserts that the Employment Agreement did not provide for a 2003 bonus, and Bergerson has not demonstrated that the "termination without cause" provision of the Employment Agreement applies to his circumstances.  Bergerson, on the other hand, contends that fact issues preclude summary judgment against him on this issue.  Specifically, Bergerson contends that he understood "termination" to mean the end of his employment with Deephaven for any reason.  Thus,

13

Bergerson maintains that a fact issue remains as to whether he was terminated without cause and thus is entitled to payment through the month in which his employment was terminated, January 2003, pursuant to the terms of the Employment Agreement.

The Court finds that as a matter of law, Bergerson is not entitled to compensation through the end of January 2003.  It is clear to the Court that Bergerson's employment was not renewed pursuant to the terms of the Employment Agreement.  This non-renewal did not, however, result in a termination that triggered the "termination without cause" provision of the Employment Agreement.  Rather, it resulted in the expiration of the Employment Agreement by its own terms. For these reasons, no genuine issue of material fact exists as to Bergerson's claims of underpayment for 2003, and summary judgment is granted against him in this regard.

III.    **Plaintiff's Motion for Summary Judgment**

Bergerson has moved for summary judgment on Deephaven's counterclaim on four separate grounds.  First, Bergerson asserts that Deephaven has failed to set forth any evidence demonstrating that Bergerson misappropriated a trade secret.  Second, Bergerson contends that Deephaven cannot present evidence sufficient to raise a genuine issue of material fact on its claim for breach of the Knight Policy Statement.  Third, Bergerson asserts that Deephaven's claim for business disparagement should be dismissed.  Finally, Bergerson contends that summary judgment should be granted on Deephaven's claim for breach of fiduciary duty.

A.    **Misappropriation; Breach of the Knight Policy Statement; Breach of Fiduciary Duty**

Deephaven asserts that its customer lists and customer information are confidential trade secrets

protected by the Minnesota Uniform Trade Secrets Act, Minn. Stat. § 325C.01, *et seq*. ("MUTSA").

Deephaven also contends that its performance results and portfolio models are confidential and

proprietary information protected by the Knight Policy Statement.  Finally, Deephaven asserts that its

employee information is protected by the Knight Policy Statement.

The misappropriation, breach of Knight Policy Statement, and breach of fiduciary duty issues

appear to the Court to be intertwined, as all of the issues appear to relate to Bergerson's alleged

acquisition and post-employment use of confidential information that he received while he was employed

at Deephaven.  The Court finds that genuine issues of fact exist as to whether the information that is at

issue was proprietary and confidential (and thus protected by the Knight Policy Statement) or a trade

secret (protected by the MUTSA).  As a result, summary judgment on these issues is inappropriate.[3]

### B.       Business Disparagement

Bergerson has also moved for summary judgment on Deephaven's claim of business

disparagement.  Deephaven asserts that after Bergerson left Deephaven, Bergerson attended an industry

conference in Barcelona, Spain.  Deephaven contends that at that conference, at least two Deephaven

clients informed Deephaven representative Jeffrey Applebaum that Bergerson had stated that Bergerson

"was Deephaven" and that "Deephaven is nothing without" Bergerson. Deephaven contends that these

comments were made by Bergerson with the intent to lure clients away from Deephaven.

---

3       In holding that an issue of fact remains as to the confidential or proprietary nature of
Deephaven's information, the Court recognizes that Deephaven may have a difficult time prevailing at
trial on this matter.  In addition, the Court does not foreclose the possibility that the issue of the
confidential or proprietary nature of this information may be an appropriate matter for Bergerson to
address by a motion in limine prior to trial.

The Court finds that summary judgment on Deephaven's counterclaim for business disparagement is appropriate. Bergerson's comments, if indeed made, were an opinion that is not actionable. In addition, the only evidence that Deephaven has presented to support their business disparagement claim is the inadmissible double hearsay testimony of Colin Smith, who heard of the alleged comments from Jeffrey Applebaum and Shailesh Vasundhra, who heard of the alleged comments from investors or brokers. (Elsass Aff. Ex. M at 8:20-10:8.) Because Deephaven has not set forth a triable issue of fact on its business disparagement claim, Bergerson's motion for summary judgment is granted.

### Conclusion

Accordingly, **IT IS HEREBY ORDERED THAT:**

1.      Plaintiff's Motion for Summary Judgment (Doc. No. 80) is **GRANTED IN PART AND DENIED IN PART**, as follows:

        a.      Plaintiff's Motion for Summary Judgment on Defendant's counterclaim regarding business disparagement is **GRANTED**; and

        b.      Plaintiff's Motion for Summary Judgment is **DENIED** on Defendant's counterclaims regarding misappropriation of trade secrets, breach of the Knight Policy Statement, and breach of fiduciary duty.

2.      Defendant's Motion for Summary Judgment (Doc. No. 88) is **GRANTED IN PART AND DENIED IN PART**, as follows:

        a.      Defendant's Motion for Summary Judgment is **GRANTED** as to Plaintiff's claims regarding his 2003 compensation;

   b.  Defendant's Motion for Summary Judgment is **GRANTED** as to

Plaintiff's claims regarding whether Deephaven breached the Employment Agreement

by using money from the 2002 domestic convertible bonus pool to pay employees who

were not "team members" for that fund; and

   c.  Defendant's Motion for Summary Judgment related to Plaintiff's other

claims regarding his 2002 compensation is **DENIED**.


Dated: February 8, 2006    s/Donovan W. Frank
           DONOVAN W. FRANK
           Judge of United States District Court